**CITY OF CORPUS CHRISTI, Appellant,**

v.

**Ralph E. KRAUSE, Appellee.**

**No. 1386.**

Court of Civil Appeals of Texas, Corpus Christi.

June 13, 1979.

. Gerald L. Benadum, Jay B. Doegey, Corpus Christi, for appellant.

Jack E. A. White, North & White, Corpus Christi, for appellee.

## OPINION

NYE, Chief Justice.

This is a pipeline easement case. Ralph E. Krause, a landowner, filed suit against the City of Corpus Christi (City) seeking to have the proposed plat of his property approved without the necessity of granting to the City a thirty-foot right-of-way easement, a condition precedent imposed by the City for approval of the plat. The City sought affirmative relief (by way of counterclaim) on the basis that it had acquired an easement by prescription across the property. After a nonjury trial, the court entered a judgment which ordered the City to remove its high pressure gas pipeline from Krause's property and to approve his plat. The trial judge filed findings of fact that supported the court's judgment.

Krause's land is located in the Flour Bluff area of Corpus Christi, Nueces County, Texas, and is situated on the south side of South Padre Island Drive near the end of the Oso Bridge. A body of water commonly called Cayo del Oso borders the property on its west side. The Krause property was originally a portion of the Ruth L. Chapman Estate which was conveyed through several intermediate owners to Krause in 1969. The City acquired its interest in the pipeline in 1952 through its two predecessors, Corpus Christi Municipal Gas Corporation and Houston Natural Gas Corporation, the latter being the original builder of the pipeline in 1952. The property in question was never improved.

In 1952, the Houston Natural Gas Corporation was in the process of extending a 12-inch high pressure gas pipeline along South Padre Island Drive into Flour Bluff. Travis Bertlet, the Houston Natural Gas Corporation "right-of-way agent" at that time, contacted the various property owners affected by the pipeline extension in order to purchase right-of-way easements. After obtaining easements from owners of the

property adjoining the property in question, Bertlet contacted representatives of the Chapman Estate. They refused to approve the placement of the pipeline across their property. In an attempt to comply with their refusal, the pipeline extension was finally located on the other side of the southern boundary of the Chapman property in question and then extended in a southerly direction through the mud flats near the edge of the Cayo del Oso which, at the time, Bertlet believed to be State property. The pipeline, however, was actually placed in a more northerly direction almost squarely through the middle of the property now owned by Krause.

In 1956, the beneficiaries under the will of Mrs. Chapman conveyed a portion of their property, including the portion now owned by Krause. At about this same time, the State Highway Department was acquiring additional rights-of-way from property owners along Padre Island Drive for the purpose of constructing a divided highway. In 1956, an additional 90-foot wide highway right-of-way area was conveyed to the State by Krause's predecessors in title. The resulting boundary line between the highway right-of-way and the property which is now owned by Krause remained fixed from 1956 until 1970, the year after Krause acquired the property.

Concurrent with the widening of the highway in 1959, Houston Natural Gas Corporation, one of the City's predecessors in interest, extended the 16-inch casing surrounding the pipeline as it passed beneath the highway an additional 97 feet to cover the width added to the right-of-way. Thereafter, certain pipeline markers were erected in the highway right-of-way proper. In 1970, Krause conveyed a triangular strip of land to the State as additional right-of-way in response to the State Highway Department's plans to build a controlled access road.

Krause started to implement his plan to develop his property into a site for a restaurant in 1972 or 1973. He solicited fill dirt in order to build up the low-lying property bordering on the Cayo del Oso to comply with City elevation standards. He hired numerous bulldozer operators to level the fill he received. The area Krause filled passed over the pipeline. In furtherance of his development plans, Krause sought to have his property platted in 1976. It was then that it was discovered that the pipeline crossed Krause's property and that the City did not have a right-of-way easement by grant. The City Planning Commission refused to approved the plat unless Krause agreed to dedicate a 30-foot easement for the gas pipeline that was already in place. Krause then unsuccessfully sought relief before the City Council. This action to compel the City to approve his plat without imposing the above described conditions followed.

After hearing the evidence of the case, the trial judge entered judgment ordering the City to remove the high pressure gas pipeline from Krause's property and, as a consequence, ordering the City to approve Krause's plat with no dedicated easement. The trial judge found, in relevant parts, the following findings of fact: 1) the high pressure gas line was built in 1952 on land then owned by Krause's predecessors in title; 2) neither Krause nor his predecessors in title had actual knowledge of the pipeline across the property until Krause attempted to file a plat of the property; 3) the City's use of the pipeline that crossed Krause's property was not open and notorious; 4) the use of the pipeline by the City and its predecessors in interest was hostile and adverse to the owners of the property in question, the alleged servient estate, and was uninterrupted, exclusive and continuous during the period from 1952 until 1976; 5) the marker and vent stand pipe would have put an engineer, construction man or other person ordinarily conversant with the subject of markers, pipelines or underground lines on notice or inquiry of the existence of the pipeline; 6) an individual ordinarily conversant with the subject of markers, pipelines, or underground lines, would have known from the marker and the vent stand pipe that such objects were located at the edge of the highway right-of-way; 7) an individual ordinarily conversant with the subject

of markers, pipelines or underground lines, would have known from the vent stand pipe of the existence of a safety casing on a gas pipeline; 8) an individual ordinarily conversant· with the subject of markers would have known from the vent stand pipe the pipeline crossed under the State highway and extended up to the highway right-of-way line; 9) neither Krause nor his predecessors in title have lived or built upon the property in question; 10) in 1952, one of the City's predecessors in interest dispatched a sizeable pipeline construction crew which used heavy equipment to trench, fit and weld the pipelines, working openly for about three weeks to install the pipeline across the property of the alleged servient estate; 11) in 1959, one of the City's predecessors in interest dispatched a construction crew of 12–15 people, together with heavy equipment, to trench and extend the pipeline casing along the existing pipeline an additional 97 feet across property which had been a part of the alleged servient estate and worked openly at the site for about a week to ten days; 12) gas crews of the pipeline owner periodically checked and replaced to two fifty-pound anodes located at the site of the gas marker and vent stand pipe; 13) gas crews of the pipeline owner periodically crossed the alleged servient estate, carrying explosimeters and probe bars, checking for gas leaks in the pipeline; 14) Flour Bluff, the area in which the property in question is situated, is well-known as a place generally underlain with numerous gas pipelines; 15) Krause's title insurance policy specifically excepted from its coverage "any pipelines over, across or on" the property; 16) the gas marker in question had the words "Gas Line" chiseled into it.

■ As a *general rule*, an easement by prescription is acquired by a use that is open and notorious, or with knowledge and acquiescence on the part of the owners of the servient tenant, together with a use that is adverse, exclusive, uninterrupted and continuous for the requisite period of time. *Rust v. Engledow*, 368 S.W.2d 635 (Tex.Civ.App.—Waco 1963, writ ref'd n. r. e.); 21 Tex.Jur.2d, Easements by Prescription, § 25 (1961). In this case, the trial

court found that neither the plaintiff nor the plaintiff's predecessors in title had actual knowledge of the pipeline and that the defendant's use of the pipeline across plaintiff's property was not open and notorious.

The City's first four points of error are "legal sufficiency" and "factual sufficiency" points which complain of the trial court's findings numbered two and three above. In these points of error and in an overlapping point of error (seven), the City argues that the trial court used an improper legal standard to determine the actual or implied knowledge issue.

■ In deciding the "legal sufficiency" points, we review the evidence only in the light most favorable to support the trial court's finding, and in deciding the "factual sufficiency" points, we must consider all of the evidence. See *Garza v. Alviar*, 395 S.W.2d 821 (Tex.Sup.1965); *In Re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). Our review of the evidence herein is directed toward the legal as well as the factual sufficiency points of error.

■ There is ample evidence in the record to support the trial court's findings that the use of the pipeline was not open and notorious and that none of the owners of the land in question, including Krause, had actual knowledge of the existence of the pipeline until it was discovered in 1976. Neither Krause nor any of his predecessors lived on the land nor added substantial improvements. Although appellant contends that the representatives of the Chapman Estate should have known of the existence of the pipeline because, after they refused to grant permission to place the pipeline on Chapman land, Bertlet acquiesced in their refusal and then described where the pipeline would be placed. Bertlet's own testimony, however, indicates that he only generally described the location of the future pipeline by stating: "We (the pipeline) would go down the south side of their front and tie on Burton Dunn until we get into the Oso on State land."

The pipeline was installed approximately four feet below the surface of the land

after only three weeks of actual work on the property in 1952. Thereafter, the pipeline itself remained undisturbed until 1959 when the pipeline's casing was extended in conjunction with other work necessary for the widening· of the highway. The casing extension was accomplished in a week to ten days. The actual work, however, commenced after that strip had been conveyed for right-of-way purposes to the State by Krause's predecessor. After that time, no other repairs or maintenance to the pipeline were made. Although some evidence shows a few workmen occasionally walked the path of the pipeline to check for gas leaks, these checks were infrequent and sporadic.

■ The City relies heavily upon the existence of the pipeline monument and vent stand pipe which were placed directly over the location of the pipeline in the highway right-of-way as evidence of actual or constructive knowledge of the pipeline. These markers, however were no located on Krause's property, but rather, were located solely upon the highway right-of-way some 12 to 14 feet from Krause's original boundary line. The pipeline monument contained no directional lines indicating the direction in which the pipeline travelled. The markers were not always visible from the highway because of weeds and grass. The City's own witnesses testified that, although the markers were visible from the highway if "you know it's there, and you're looking for it," the markers did not indicate whether the pipeline went parallel or perpendicular to the right-of-way. Only if the pipeline were located perpendicular to the highway right-of-way, would it have crossed Krause's property. Otherwise, (if it were parallel) it would be located solely within the State's highway right-of-way. This inconclusive evidence did not establish Krause's actual or constructive knowledge of the pipeline over his property.

In the case of *Wiesel v. Smira*, 49 R.I. 246, 142 A. 148 (1928), 58 A.L.R. 818 (1929), a case cited by the City, the easement was held to be one by implication, and not by prescription. The sewer line was laid by the original owner of the lot before convey-ance to the litigants. The Court in that case quotes from 2 Tiffany, Real Property, 2d Ed., p. 1278, to the effect that an easement is apparent if its existence is indicated by signs which might be seen or known on a careful inspection by a person ordinarily conversant with the subject. The City also relies upon other implied easement appurtenant cases to support its contention that the above test should be used to determine whether the use by the City of the pipeline was open and notorious. See *Lake Meredith Development v. City of Fritch*, 564 S.W.2d 427 (Tex.Civ.App.—Amarillo 1978, no writ); *Westbrook v. Wright*, 477 S.W.2d 663 (Tex.Civ.App.—Houston [14th Dist.] 1972, no writ); *Houston Pipeline Co. v. Brown*, 361 S.W.2d 884 (Tex.Civ.App.—Houston [1st Dist.] 1962, writ ref'd n. r. e.); *Jones v. Harmon*, 175 Cal.App.2d 869, 1 Cal.Rptr. 192 (1959).

■ Here, there is ample evidence that a person ordinarily conversant with underground high-pressure gas pipelines, upon an inspection of the markers in question, could reasonably conclude that, although the pipeline existed, it did not cross Krause's land but rather, ran parallel to the highway right-of-way. In the case of *Jones v. Harmon*, 175 Cal.App.2d 869, 1 Cal.Rptr. 192 (1959), relied upon by the City, the court relied upon certain visible installations characteristic of an irrigation system *because they were located in such an alignment in relation to the land in question as to indicate the probable course of the conduit thereunder.* Such is not the case before us.

We conclude that the evidence supports the trial court's findings. In addition, we have examined all of the other evidence in the record and conclude that the trial court's findings are not contrary to the great weight and preponderance of the evidence. See *Houston Pipeline Company v. Brown*, 361 S.W.2d 884 (Tex.Civ.App.—Houston [1st Dist.] 1962, writ ref'd n. r. e.); *Maricle v. Hines*, 247 S.W.2d 611 (Tex.Civ. App.—Fort Worth 1952, no writ). Our disposition of these points of error is consistent with the weight of authority from other

jurisdictions. See Annotation, Easements by Prescription in Artificial Drains, Pipes or Sewers, 55 A.L.R.2d 1144, 1166–70 (1957). Appellant's points of error one through four and number seven are hereby overruled.

■ In point of error number five, the City complains that the trial judge improperly considered facts not in evidence in making his findings of fact and conclusions of law adverse to the City. The only authority cited in support of this point of error is totally unrelated to this contention. This point of error fails to meet the minimum briefing rules prescribed by Rule 418, Texas Rules of Civil Procedure, and is waived. See *Continental Oil Company v. Dobie*, 552 S.W.2d 183 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n. r. e.), and our local rules attached thereto as an appendix.

■ Even if we were to consider this point of error on the merits, it would be overruled. As a general rule, the trial judge is presumed to consider only the evidence properly before him in evidence. See *Creager v. Douglas*, 77 Tex. 484, 14 S.W. 150 (1890); *Yzaguirre v. State*, 427 S.W.2d 687 (Tex.Civ.App.—Corpus Christi 1968, no writ). In addition, reversible error is not present where, as here, there is ample evidence to support the trial court's findings and the error, if any, would not affect or change the judgment. Rule 434, Texas Rules of Civil Procedure. See *Aultman v. Dallas Railway & T. Co.*, 152 Tex. 509, 260 S.W.2d 596 (1953); *Colonial Life & Accident Ins. Co. v. Squynes*, 550 S.W.2d 413 (Tex. Civ.App.—Corpus Christi 1977, writ ref'd n. r. e.); *Rodriguez v. Priest*, 126 S.W. 1187 (Tex.Civ.App.1910, writ ref'd). Appellant's point of error number five is hereby overruled.

■ In point of error number six, the City complains that the trial court judge abused his discretion in refusing to hear oral argument following the submission of trial briefs. The trial judge is vested with considerable discretion in determining whether or not to hear oral arguments concerning a case tried before him alone. The exercise of such discretion should not be questioned, unless the party complaining of such can show that he has been deprived of some substantial right or benefit. The refusal of the trial judge to hear oral arguments will not be grounds for reversal, unless it is made to appear that the judgment of the court was improperly rendered. *Rodriguez v. Priest*, 126 S.W. 1187, 1189 (Tex. Civ.App.1910, writ ref'd). No abuse of discretion has been shown here. Appellant's point of error number six is overruled.

■ In its remaining points of error (eight and nine), the City attempts to attack, on legal and factual sufficiency grounds, the trial court's finding that the pipeline built in 1952 was upon land then owned by Krause's predecessor in title. Although the City generally discusses some of the evidence relating to this finding, the City presents us with absolutely no authority to support its contention that the evidence which supports the finding is without probative force. These points have been considered and are overruled. Appellant's points of error eight and nine are overruled.

The judgment of the trial court is AFFIRMED.